**U.S. BANK NATIONAL ASSOCIATION, a national banking association, and U.S. Bank Trust National Association, a national association, Plaintiffs,**

v.

**The FIRST NATIONAL BANK OF KEYSTONE, a national banking association, Keystone Mortgage Corporation, Inc., and The Federal Deposit Insurance Corporation, as receiver of the First National Bank of Keystone Defendants.**

No. Civ.A. 1:00–1138.

United States District Court,
S.D. West Virginia,
Bluefield.

April 6, 2005.

---

C. William Davis, Bluefield, WV, Perry M. Wilson, III, Shelley L. Parnell, Minneapolis, MN, for Plaintiffs.

Charles T. Miller, Stephen M. Horn, Charleston, WV, John A. Davidovich, Washington, DC, for Defendants.

## MEMORANDUM OPINION

FABER, Chief Judge.

This matter came before the court on the parties' cross motions for summary

judgment. By Order entered March 31, 2004, the court granted in part and denied in part plaintiffs' motion for summary judgment. The court also granted in part and denied in part defendants' motion for summary judgment. The reasons for those rulings follow.

## Background

Plaintiffs U.S. Bank National Association and U.S. Bank Trust National Association (collectively, the "Banks")[1] transacted a number of times with defendants Keystone Mortgage Corporation, Inc., ("KMC") and The First National Bank of Keystone ("Keystone") between 1993 and 1998. (Compl. ¶ 7, Answer ¶ 7) In these transactions it was agreed the Banks would act as trustees to a series of loan trusts sold by Keystone and KMC. (Compl. ¶ 7, Answer ¶ 7) Each transaction consisted of at least two contracts; a Custodial Agreement and either a Pooling and Servicing Agreement ("PSA") or an Indenture Agreement (PSA and Indenture Agreement collectively referred to as, the "Agreements"). See Defendants' Memorandum in Support of Motion for Summary Judgment (hereinafter "Defendants' Memo at ____") at 2–3; Weider Affidavit Exhibits C and G.

Plaintiffs, as trustees, are required by the Agreements to collect on loans in the trust pool, distribute collections to investors, and prepare and distribute reports to investors. See Defendants' Memo at 2. Plaintiffs are compensated for this service by making a deduction from the gross collections before distributing the collections to the investors. See id. Additionally, the Agreements contained indemnification provisions requiring plaintiffs to be reimbursed for reasonable expenses under certain circumstances. See id. at 7–8;

Plaintiffs' Memorandum in Support of Motion for Summary Judgment (hereinafter "Plaintiff's Memo at ____") at 4–7. Furthermore, defendants were obligated to repurchase loans that did not meet the standards set forth in the Agreement. Defendants' Memo at 2; Plaintiffs' Memo at 2.

On September 1, 1999, defendant Federal Deposit Insurance Corporation ("FDIC") was appointed receiver of Keystone as a result of Keystone being declared insolvent. See Defendants' Memo at 3. As receiver, the FDIC succeeded to all rights, titles, powers, privileges, and assets of Keystone, including defendant KMC, the residual interest in the loan trusts, the Agreements, and Custodial Agreements. See Answer ¶ 4; Defendants' Memo at 3; Plaintiffs' Memo at 2.

Shortly thereafter, the FDIC, aided by the Banks, began examining the residual loan interests for valuation purposes. See Malami Aff. ¶ 9; Defendants' Memo at 3; Plaintiffs' Memo at 3. Plaintiffs requested that the FDIC pay them for their work according to a "fee schedule" because they believed their compensation under the Agreements did not contemplate such extensive work. See Malami Aff. ¶ 10; Defendants' Memo at 3; Plaintiffs' Memo at 3. The Banks began submitting invoices to the FDIC, to which it did not object. See Malami Aff. ¶ 10; Defendants' Memo at 3; Plaintiffs' Memo at 3. During the course of their engagement, the Banks revised their fee schedule several times to reflect a change from a maximum rate of $150 per to $300 per hour. See Weider Affidavit ¶ 19) Some of those invoiced fees were paid, others were not. See Defendants'

---

1. Plaintiff U.S. Bank Trust National Association merged into Plaintiff U.S. Bank National Association in 2002. See Weider Affidavit ¶ 3.

Memo at 8; Plaintiffs' Memorandum in Opposition at 3.

Also, beginning in the fall of 1999, the FDIC, KMC, and the Banks attempted to resolve loan documentation problems. *See* Defendants' Memo at 4; Plaintiffs' Memo at 3. To cure these deficiencies the parties attempted to execute a deal under which the Banks would obtain a power of attorney. *See* Defendants' Memo at 4; Weider Affidavit ¶ 15. Ultimately, the deal failed. *See* Defendants' Memo at 4; Weider Affidavit ¶ 15.

On March 31, 2000, the Banks filed proof of claim forms with the FDIC for $752 million in defaulted loans as a result of the breakdown in power of attorney discussions. *See* Defendants' Memo at 4; Plaintiffs' Memo at 3. They believed the FDIC was obligated under the Agreement to either cure the documentation problems or repurchase the loans.[2] *See* Defendants' Memo at 4; Plaintiffs' Memo at 3. On May 18, 2000, the FDIC responded by both requesting the Banks substantiate any actual damages and informing them that any allowed claims would only be settled with receiver's certificates. *See* Malami Affidavit ¶ 15 and Exhibit C; Defendants' Memo at 5. The Banks allege that in September 2000, they received a letter from the FDIC declining to pay their claim, except with receiver certificates.[3] *See* Weider Affida-

vit ¶ 9) Further, the letter informed the Banks that recovery on their claims would be precluded if they did not file a lawsuit in 60 days. *See* Weider Affidavit ¶ 9.

The Banks, feeling they had not received satisfaction on their claim, filed lawsuit 1:00–1119, seeking $741 million from the FDIC and $349 million from KMC, in order to preserve their claim. *See* Defendants' Memo at 5; Plaintiffs' Memo at 4. Later, plaintiffs moved to dismiss the suit because the loans ultimately cured themselves. *See id.;* Plaintiffs' Memo at 3. On September 30, 2003, this court granted the plaintiffs' motion and dismissed the case with prejudice. *See* Civil Action No. 1:00–1119, Docket Sheet Exhibit Number 29. The court did, however, allow the plaintiffs' claims for attorneys' fees, trustee fees, and costs to carryover to the current action. *See id.* The Banks claim they are entitled under the indemnification provision of the Agreements to be reimbursed for $76,000 they incurred in attorneys' fees, costs, and expenses in that case. *See* Plaintiffs' Memo at 3.

Also on March 31, 2000, the Banks filed proof of claim forms for document collateral services fees and expenses and outstanding extraordinary trustee fees and expenses, including attorneys' fees and costs.[4] *See* Weider Affidavit Exhibit D.

---

**2.** The claim was later amended on April 21, 2000. *See* Malami Affidavit ¶ 15 and Exhibit C.

**3.** There seems to be some disagreement among the parties as to the ultimate outcome of the claim prior to the lawsuit. The Banks, apparently unhappy with receiver's certificates, allege that they received no satisfaction at all. *See* Plaintiffs' Memo at 3. However, the FDIC alleges that parts of the claim were handled differently. It alleges that post-receivership claims were paid in cash as administrative expenses, pre-receivership claims with receiver's certificates, and ineligible or inadequately documented claims not at all.

*See* Defendants' Memo at 5. Perhaps these two positions can best be reconciled by the FDIC's admission that most were denied on inadequate documentation grounds.

**4.** The claim for document collateral services and the claim for extraordinary trustee fees were given claim numbers 500000501 and 50000048, respectively, presumably by the FDIC. Further the claim for extraordinary trustee fees is stamped received on April 4, 2000 by Claims/NADL, presumably a FDIC department.

Both Proof of claim forms reference "attached documentation" in the description of

The claim for document services was for $284,387.71 and the claim for extraordinary trustee fees was for $151,308.87. *See id.* Shortly thereafter, the Banks received approximately $25,577.50 as partial payment for extraordinary trustee fees. *See* Compl. ¶ 8; Weider Affidavit ¶ 20. To protect their interest in the claims, the Banks filed this lawsuit, civil action 1:00–1138, on December 4, 2000. *See* Weider Affidavit ¶ 28. In total, the complaint alleges damages in the amount of $254,309.70.[5]

On March 11, 2003, the Banks filed a motion for summary judgment. The supporting memorandum alleges entitlement to $593,427.43 [6] in damages. *See* Plaintiffs' Memo at 2. They allege that the FDIC agreed to pay them according to a fee schedule for work done over and beyond their contractual duties and that the FDIC's breach of the obligation resulted in damages of $160,821.25. *See id.* at 9–13. Plaintiffs also contend that the FDIC failed to reimburse them for $210,821.29 in attorneys' fees [7] and $7,145 in out-of-pocket expenses, which they are entitled to under the indemnity provisions of the Agreements. *See id.* at 13. Third, plaintiffs contend they are owed $179,304.11 in custodial fees according to the terms of the Custodial Agreements. *See id.* at 14. Finally, as a result of the outstanding balances above, plaintiffs contend they are entitled to $35,335.77 in interest. *See id.*

On April 8, 2003, defendants responded with their own motion for summary judgment. Thereafter, plaintiffs responded to defendants' motion.

## Legal Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact, and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant bears the initial burden of identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). If the respondent fails to rebut this showing by identifying specific facts establishing a genuine triable issue, the movant may then be entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. "[I]n ruling on a motion for summary judgment, the [court] must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson,* 477 U.S. at 254, 106 S.Ct. 2505.

## Analysis

Plaintiffs' claims can be categorized under three headings: 1) Contracts between the Banks, Keystone, and KMC; 2) Contracts between the Banks and FDIC; and 3) prejudgment interest. While defendants have multiple theories on why they should be granted summary judgment, the court will first address their theory alleg-

---

(invoice) claim section. The attachments were not, however, provided to the court.

5. The complaint itemizes the damages as $125,731.37 in custodial fees and bank services and $128,508.33 in custodial services. (Complaint ¶¶ 8,9).

6. The court's calculation of this figure, from the itemized figures provided, yields a sum of $593,427.42.

7. This amount includes $76,000 in attorneys' fees expended on civil action 1:00–1119.

ing the court does not have jurisdiction due to plaintiffs' failure to exhaust their administrative remedies. Defendants' Memo at 10–13.

### A. *Administrative Exhaustion Requirement*

The Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA" or "the Act"), 12 U.S.C. § 1821(d), is a statutory outline of the "plowers and duties of [FDIC] as conservator or receiver" of Keystone. 12 U.S.C. § 1821(d).[8] The Act places limitations on the court's jurisdiction over actions concerning claims against the FDIC. *See* 12 U.S.C. § 1821(d)(13)(D).[9] A court has jurisdiction over a FIRREA claim only after a party's claim is denied. *See* 12 U.S.C. § 1821(d)(6);[10] *see also Tillman v. Resolution Trust Corp.,* 37 F.3d 1032 (4th Cir. 1994). Therefore, a claim must first be submitted and then denied for the court to have jurisdiction.

▮ In their brief, defendants extensively outlined the FIRREA claims procedure and then made a conclusory allegation that plaintiff never submitted the proof of claim forms necessary for administrative determination. *See* Defendants' Memo at 13 ("Plaintiff has failed to file a proof of claim for the requested costs and fees they seek in this litigation."). The record simply does not support this allegation; indeed, defendants' own affiant, Ralph Malami, even swore to the contrary. *See* Malami Aff. ¶¶ 14–15 ("On March 31, 2000 U.S. Bank filed proofs of claim in the Keystone receivership. I received copies of those claims when they were filed and have had numerous discussions with our claims agents about those claims. On April 21, 2000, U.S. Bank filed amended

---

**8.** All statutory citations will be to Title 12, United States Code, unless noted otherwise.

**9.** § 1821(d)(13)(D) reads in full:

Limitation on judicial review
Except as otherwise provided in this subsection, no court shall have jurisdiction over
(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
(ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

**10.** § 1821(d)(6) reads in full:

Provision for agency review or judicial determination of claims
(A) In general
Before the end of the 60–day period beginning on the earlier of-
(i) the end of the period described in paragraph (5)(A)(i) with respect to any claim against a depository institution for which the Corporation is receiver; or

(ii) the date of any notice of disallowance of such claim pursuant to paragraph (5)(A)(i), the claimant may request administrative review of the claim in accordance with subparagraph (A) or (B) of paragraph (7) or file suit on such claim (or continue an action commenced before the appointment of the receiver) in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim).
(B) Statute of limitations
If any claimant fails to—
(i) request administrative review of any claim in accordance with subparagraph (A) or (B) of paragraph (7); or
(ii) file suit on such claim (or continue an action commenced before the appointment of the receiver), before the end of the 60–day period described in subparagraph (A), the claim shall be deemed to be disallowed (other than any portion of such claim which was allowed by the receiver) as of the end of such period, such disallowance shall be final, and the claimant shall have no further rights or remedies with respect to such claim.

proofs of claim."). Furthermore, the only other "evidence" in the record, the Wieder affidavits, make clear that proofs of claim were filed. Weider Aff. ¶¶ 8, 28 ("Acting to protect the interests of the investors, U.S. Bank filed proofs of claims to preserve the repurchase obligation of First National Bank of Keystone and Keystone Mortgage Corporation ... When FDIC did not compensate U.S. Bank for services provided to it and provided to investors as described above, U.S. Bank at the request of FDIC, filed a claim pursuant to 12 U.S.C. § 1821. Copies of the claim forms are attached hereto as Exhibit D. FDIC responded to the claims by paying them in part and denying them in part...."). There is overwhelming evidence that FDIC received and considered some sort of claim for the damages the Banks allege. Both plaintiffs' and defendants' affidavits are filled with reports and correspondences between the parties showing that FDIC was aware of plaintiffs' claims, and in some instances even made partial payments. *See id.*

Accordingly, because defendants have failed to come forward with any *evidence* that supports their argument that proofs of claim were never filed, *see* Malami Aff. generally,[11] the court finds they were filed and concludes it has jurisdiction over this lawsuit.

## B. *Receivership Certificate*

Defendants argue that plaintiffs' request for fees and costs may not be regarded or paid as administrative expenses of the receiver, but are, instead, payable under 12 U.S.C. § 1821(d)(11)(A)(iii) by receiver's certificates as general unsecured claims.

However, as plaintiffs point out, this argument is directly contradicted by the express provisions of FIRREA.

■ With respect to services performed after the FDIC's appointment as receiver and prior to repudiation, 12 U.S.C. § 1821(e)(7)(B) provides:

> If, in the case of any contract for services described in subparagraph (A),[12] the conservator or receiver accepts performance by the other person before the conservator or receiver makes any determination to exercise the right of repudiation of such contract under this section—
>
> (i) the other party shall be paid under the terms of the contract for the services performed; and
>
> (ii) the amount of such payment shall be treated as an administrative expense of the conservatorship or receivership.

Accordingly, FIRREA makes clear that, because the FDIC accepted performance under the pre-receivership contracts and did not repudiate them, plaintiff is to be paid according to the terms of the contracts and the amount of the payment is to be treated as an administrative expense.[13] With respect to the post-receivership contract for services, the FDIC has conceded they must be paid as provided in the agreement.

## C. *Contract Liability*

### *PSAs, Indenture Agreements, and Custodial Agreements*

Each transaction between the Banks and Keystone or KMC involved two contracts. One was a Custodial Agreement

---

11. Indeed, as noted above, the defendants' evidence supports plaintiffs' position that proofs of claim were filed.

12. Subparagraph (A) refers to "any contract for services between any person and any insured depository institution for which the

Corporation has been appointed conservator or receiver...." 12 U.S.C. § 1821(e)(7)(A).

13. Indeed, the FDIC does not even mention this provision of FIRREA in its brief.

and the other was either a PSA or an Indenture Agreement. When FDIC took over as receiver it succeeded to the rights Keystone and KMC had under the contracts.[14] However, FDIC had the right to repudiate the contracts within a reasonable time.[15] To date, the FDIC has not repudiated any of the agreements, so the contracts are binding upon both the Banks and the FDIC.

Because the contracts govern services the Banks provide to FDIC, 12 U.S.C. § 1821(e)(7)(B) comes into play. That provision reads:

> (B) Services performed after appointment and prior to repudiation. If, in the case of any contract for services described in subparagraph (A), the conservator or receiver accepts performance by the other person before the conservator or receiver makes any determination to exercise the right of repudiation of such contract under this section-
>
> (i) the other party shall be paid under the terms of the contract for the services performed; and

(ii) the amount of such payment shall be treated as an administrative expense of the conservatorship or receivership.

12 U.S.C. § 1821(e)(7)(B).

### D. Classes of Damages

As noted earlier, plaintiffs seek damages totaling $593,427.42.[16] This figure is comprised of $179,304.11 in custodial fees according to the terms of the Custodial Agreements; $210,821.29 in attorneys' fees and $7,145 in out-of-pocket expenses, which it claims entitlement to under the indemnity provisions of the Agreements; extra work done in accordance with terms agreed upon by both plaintiffs and the FDIC in the amount of $160,821.25; and interest in the amount of $35,335.77.

### Custodial Fees

Plaintiffs allege that under the terms of the Custodial Agreements defendants are obligated to pay the Banks $179,304.11 in fees for their services, such as the annual administration of the trusts. Plaintiffs' Memo at 14. Defendants do not dispute

---

14. § 1821(d)(2)(A) reads:
   (2) General powers
   (A) Successor to institution
   The Corporation shall, as conservator or receiver, and by operation of law, succeed to—
   (i) all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution; and
   (ii) title to the books, records, and assets of any previous conservator or other legal custodian of such institution.

15. § 1821(e)(1,2) read:
   (e) Provisions relating to contracts entered into before appointment of conservator or receiver
   (1) Authority to repudiate contracts
   In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institu-

tion may disaffirm or repudiate any contract or lease—
   (A) to which such institution is a party;
   (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
   (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.
   (2) Timing of repudiation
   The conservator or receiver appointed for any insured depository institution in accordance with subsection (c) of this section shall determine whether or not to exercise the rights of repudiation under this subsection within a reasonable period following such appointment.

16. The court's calculation of this figure, from the itemized figures provided, yields a sum of $593,427.42.

this contractual obligation. Defendants' Memo at 2 ("[T]he FDIC and KMC have previously paid and are willing to pay all appropriate and properly documented custodial fees. To the extent any portion of the requested damages includes unpaid custodial fees, the Defendants will pay those fees."). Rather, defendants argue that plaintiffs have failed to perform certain of this work and failed to provide adequate documentation that the work has been done. *See* Malami Aff. ¶ 11. Plaintiffs counter, stating that they have only billed defendants for work completed and that they has provided adequate documentation. Second Wieder Aff. ¶ 3.

■ Unfortunately, defendants have failed to identify with specificity what portion of the $179,304.11 represents work they contend was never performed or for which adequate documentation was never received. Obviously, if defendants contend that a portion of the custodial fees represents work never performed and plaintiffs contend otherwise, as to this portion of the fees there exists a material issue of fact which will have to be resolved at trial. Accordingly, within twenty days of entry of this Memorandum Opinion, defendants are to file with the court a document which breaks down that portion of the $179,304.11 in requested custodial fees which it contends represents work never received or inadequately documented. The document is to break down the amount(s) by date, invoice number (where appropriate), and the specific deficiency alleged. Once that document is filed, the court can enter an Order that awards plaintiffs the uncontested amount and the contested amount will be sufficiently narrowed for trial.

### Attorneys' Fees and Out-of-Pocket Expenses

The parties agree that a disputed issue under the PSAs and Indenture Agreements is the application of an indemnification provision that appears in every agreement. Section 8.05 of the PSA reads,

Trustee's Fees and Expenses; Indemnification . . . .

(b) The Seller shall indemnify the Trustee and its agent for, and hold them harmless against, any loss, liability or expense (including **reasonable** expenses, disbursements and advances incurred or made by the Trustee in accordance with any of the provisions of this Agreement (including the reasonable compensation and the expenses and disbursements of its counsel and of all Persons not regularly in its employ)) incurred by the Trustee or such agent without negligence, willful misfeasance or bad faith on the part of the Trustee or any such agent and arising out of or in connection with the acceptance or administration of the trusts created hearby, including without limitation the costs and expenses of defending the Trustee or any such agent against any claim or liability incurred by them in connection with the exercise or performance of any of their powers or duties hereunder, including the signing of any document pursuant to this Agreement, and including without limitation any liability incurred by the Trustee arising from the Seller's bad faith, willful misfeasance, or negligence. The obligations set forth in this Section 8.05(b) shall survive the termination of this Agreement.

(emphasis added).

Similarly, Section 6.7 of the Indenture Agreement states,

*Compensation and Indemnity.* As compensation for its services hereunder the Indenture Trustee shall be entitled to receive, on each Distribution Date, the Indenture Trustee's Fee Pursuant to

Section 5.01 of the Sale and Servicing Agreement (which compensation shall not be limited by any law on compensation of a trustee of an express trust) and shall be entitled to reimbursement for all reasonable and out-of-pocket expenses incurred or made by it, including cost of collection, in addition to the compensation for its services. Such expenses shall include the **reasonable** compensation and expenses, disbursements and advances of the Indenture Trustee's agents, counsel, accountants and experts. The Trust agrees to cause the Seller to indemnify the Trust Estate and the Indenture Trustee against any and all loss, liability or expense (including attorney's fees) incurred by it in connection with the administration of this trust and the performance of its duties hereunder. The Indenture Trustee shall notify the Trust and the Seller promptly of any claim for which it may seek indemnity. Failure by the Indenture Trustee to so notify the Trust and the Seller shall not relieve the Trust of its obligations hereunder. The Trust shall or shall cause the Seller to defend any such claim, and the Trust shall or shall cause the Seller to pay the fees and expenses of such counsel. Neither the Trust nor the Seller need to reimburse any expense or to indemnify against any loss, liability or expense incurred by the Indenture Trustee through the Indenture Trustee's own willful misconduct, negligence or bad faith.

The Trust's payment obligations to the Indenture Trustee pursuant to the Section shall survive the discharge this Indenture. When the Indenture Trustee incurs expenses after the occurrence of a Default specified in *Section 5.1(e) or (f)* with respect to the Trust, the expenses are intended to constitute expenses of administration under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or similar law.

(emphasis added).

It is clear to the parties that plaintiffs are entitled to reimbursement of reasonable expenses incurred. The issue is whether the $210,821.29 in attorney's fees and $7,145 in out-of-pocket expenses the Banks incurred were in fact reasonable.

With regard to the $210,821.29, the expenses were incurred while defending the Trust, responding to investigation inquiries, and bringing this lawsuit and civil action no. 1:00–1119. While defendants seem to have trouble with the reasonableness of all the expenses, they have particular trouble with the expenses incurred in bringing suit against them. It is their position that the lawsuits not only represent breaches of plaintiffs' fiduciary duty, but are also unreasonable because any money recovered would funnel back to the defendants as part of their share. Regardless of where the money would end up, plaintiffs, as trustees, were obligated to act in the best interest of the trust, even if that meant bringing suit against one of the trusts certificate holders. Indeed, any other conclusion would be illogical and result in sellers of loans reserving an interest in the trust simply to escape liability.

■ On the record before it, the court believes that the majority, if not all, of the amount requested by plaintiffs to be "reasonable" within the meaning of the Agreements. However, because this determination concerns disputed issues of fact, the court will reserve judgment until trial when it can assess all the evidence and make detailed findings.

### Trustee Fees for Extra Work

As discussed above, after FDIC was appointed receiver, it began requesting information from the Banks. Believing the ex-

tensive requests not to be covered under the trustee's fee, in September of 1999, the Banks arranged with the FDIC to be compensated according to a fee schedule ("September 1999 Agreement") which was embodied in an email from Pamela Wieder to Ralph Malami. The September 1999 Agreement provided for a rate of $150.00 per hour to be received by the Banks as payment for this extra work. The FDIC did not object to the arrangement and has made partial payments on the bills for these services.

Over the next several years, plaintiffs increased the rates charged. According to the FDIC, it was never informed that the Banks were going to increase their rates from the original $150.00/hour and, in fact, did not know the hourly rate had changed until September 17, 2002. *See* Malami Aff. ¶ 10. The FDIC has indicated that it is willing to pay appropriate and properly documented trustee fees to the Banks at the rate of $150.00 per hour. *See id.* at ¶ 34.

The FDIC fails to adequately address why it thinks plaintiffs are not entitled to any fees over and above the $150.00 agreed to in the September 1999 Agreement. Is it the contention of the FDIC that plaintiffs could not raise its hourly rate at any time over the course of four years? Or, does the FDIC's objection go to the amount of the change, rather than the ability of the plaintiff to make a change? The court cannot determine if its objection is based on contract law, equity, or something else. Its briefing on this matter is devoid of any legal authority.

The plaintiffs, on the other hand, direct the court to the case of *In re Estate of Prankard,* 187 Misc.2d 566, 723 N.Y.S.2d 315 (2000),[17] for the proposition that "corporate trustees are presumptively entitled to compensation based on their standard fee schedules." Plaintiffs' Memo at 12. The FDIC contends that plaintiffs' reliance on *Prankard* is misplaced because the standard fee schedule is only one of the factors relied upon by the court to determine the reasonableness of the fees charged.

In *Prankard,* a New York case, the court held that when analyzing a request for fees made by a corporate trustee under a testamentary trust in contested proceedings, the court should consider the following criteria in assessing the reasonableness of the fees: 1) the size of the trust; 2) the responsibility involved; 3) the character of the work involved; 4) the results achieved; 5) the knowledge, skill, and judgment required and used; 6) the time and services required; 7) the manner and promptness in performing its duties; 8) any unusual skill or experience of the trustee; 10) the amount of risk; 11) the custom in the community for allowance to trustees; and 12) any estimate of the trustee of the value of its services. *See Prankard,* 187 Misc.2d at 578–79, 723 N.Y.S.2d 315. In addition, the court should accord appropriate weight to the fiduciary's published fee rates within its respective marketplace as a significant factor for consideration. *See id.* at 579, 723 N.Y.S.2d 315.

■ According to plaintiffs, "[u]nder the factors set forth in *Prankard,* U.S. Bank's fees are reasonable and should form the basis for compensation sought here." Plaintiffs' Memo at 12. Even assuming that plaintiffs are correct in contending that the court should apply the *Prankard* factors and determine whether the fees charged with respect to the extra work are reasonable, it is clear that the record is not developed enough to undertake this sort of

---

17. The parties are apparently in agreement that New York law applies because plaintiffs have argued that it does and the FDIC does not contend otherwise.

analysis. Furthermore, the court is not convinced that it is necessary to reach this analysis in view of the fact that, unlike *Prankard,* there was an agreement between the parties regarding the fees to be charged. In short, neither party has convinced the court that they are entitled to summary judgment on this issue.

### Interest

Plaintiffs have also requested interest in the amount of $35,335.77. Plaintiffs fail, however, to identify any provision in the operative agreements or otherwise which entitles them to interest in any amount, much less at the Federal Funds Rate. Accordingly, plaintiffs' motion for summary judgment as to interest is denied and defendants' motion for summary judgment as to interest is granted.

### Conclusion

Once the court receives the requested documentation from defendants, it will enter an order scheduling this case for trial in early summer. The Clerk is directed to FAX and mail copies of this Memorandum Opinion to counsel of record.